IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHERYL ANN CEPHAS, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 15-1121-RGA |
| | : |
| CAROLYN COLVIN, Acting | : |
| Commissioner of Social Security | : |
| | : |
| Defendant. | : |

## **MEMORANDUM OPINION**

_____

Cheryl Ann Cephas, Dover, Delaware; Pro Se Plaintiff.

Nora Koch, Acting Regional Chief Counsel Social Security Administration, and Melissa
K. Curry, Assistant Regional Counsel, Office of the  General Counsel, Philadelphia,
Pennsylvania; Charles M. Oberly, III, United States Attorney for the District of Delaware,
Wilmington, Delaware; Heather Benderson, Special Assistant United States Attorney,
Office of the General Counsel, Philadelphia, Pennsylvania, Attorneys for Defendant.

January $\partial b$ , 2017
Wilmington, Delaware

*Richard G. Andrews*
**ANDREWS, U.S. District Judge:**

Plaintiff, Cheryl Ann Cephas, who appears *pro se*, appeals the decision of Defendant Carolyn Colvin, Acting Commissioner of Social Security, denying her applications for disability insurance benefits under Title II, and supplemental security income benefits under Title XVI, of the Social Security Act. *See* 42 U.S.C. §§ 401-434, 1381-1383f. Jurisdiction exists pursuant to 42 U.S.C. § 405(g). Presently pending before the Court are cross-motions for summary judgment filed by Cephas and the Commissioner. (D.I. 11, 15). Briefing is complete.

## I. BACKGROUND

### A. Procedural History

Cephas protectively applied for disability insurance benefits on November 22, 2011, alleging disability as of June 1, 2011. (D.I. 8-5 at 2-15; D.I. 8-6 at 15). She amended the onset date to June 13, 2012. (D.I. 8-5 at 33) Cephas' application was initially denied on March 26, 2012, and upon reconsideration on December 11, 2012. (D.I. 8-3 at 3-65). An administrative hearing was held on March 25, 2014, before an Administrative Law Judge. (D.I. 8-2 at 30-77). Testimony was provided by Cephas and a vocational expert. The ALJ issued a decision on May 8, 2014, finding that Cephas was not disabled. (*Id.* at 13-29). She sought review by the Appeals Council, and her request was denied on October 1, 2015, making the ALJ's decision the final decision of the Commissioner. (D.I. 8-2 at 4-7). On December 4, 2015, Cephas filed the current action for review of the final decision. (D.I. 2).

## B.    Plaintiff's Testimony

Cephas was 50 years old when she testified at the March 2014 hearing. (D.I. 8-2 at 36). She is 5'0" and weighs 189 pounds. (*Id.*). She completed the 11th grade and has previous work experience as a hotel housekeeper and as a floater at a food company. (*Id.* at 37, 38-42, 71). She does not have a driver's license, having lost it due to a DUI. (*Id.* at 36). Cephas lives with her parents. (*Id.* at 57). She has bipolar issues, reading issues, needs help with writing, and can perform simple math. (*Id.* at 37-38).

Cephas' mother prepares her meals, but she can make a sandwich and use the microwave. (*Id.* at 63, 64). She tries to help with household chores, goes shopping with her mother, and tries to help putting items away. (*Id.* at 64-65). She is able to keep track of her money and pay her bills. (*Id.* at 65). She watches a lot of television and tries to read. (*Id.* at 67). Cephas does not socialize, but attends church, Bible study, and AA meetings. (*Id.* at 66, 67).

Cephas has a thyroid condition that is controlled with medication. (*Id.* at 54). She also has diabetes that is controlled as long as she keeps her weight down. (*Id.*). In addition, she was diagnosed with chronic obstructive pulmonary disease and sleep apnea. (*Id.* at 68).

Cephas testified that she stopped working in 2010 because she was going to have hand surgery, but the surgery was called off. (Id. at 42-43). She testified that she could not return to work because she was not cleared, so she was separated from

2

employment. (*Id.* at 43). The record also indicates that she was laid off. (D.I. 8-6 at 15).

Cephas is left-handed. (*Id.* at 49). She had surgery on both hands in 2012 and 2013, but still has trouble with them. (*Id.* at 44). She testified that the right hand is worse since the surgery, and her left hand did not improve after surgery and has "gotten worse." (*Id.* at 49-51). She also has mild arthritis of the left thumb for which she receives injections and wears a brace. (*Id.* at 51). She has numbness and tingling in both hands all the time, and they swell "a lot." (*Id.* at 53). Cephas uses her right hand to button and zip her clothing, uses her fingers to feed herself, holds grooming items the best she can, and does everything primarily with her right hand. (*Id.* at 51-52). She is able to get dressed. (*Id.* at 63).

Cephas has fibromyalgia. (*Id.* at 44). She takes Lyrica for pain and joint swelling she described as "over her entire body;" in her nerves, muscles, joints, and arms. Cephas rated pain without the medication at "about a nine" and with medication, "she goes to sleep," and when she wakes up, "it starts again." (*Id.* at 46). She also has neck pain and osteoarthritis in her back and was prescribed "some type of medication," but it does not really help. (*Id.* at 47-48). She described the back and neck pain at nine. (*Id.* at 49). Cephas testified upon her physician's recommendation, she uses a cane for standing still and walking because her knees and body hurt, she feels like she cannot use her feet, and some days she cannot walk. (*Id.* at 49, 50, 69). Cephas testified that she cannot walk more than 20 minutes, cannot do too much standing, can sit anywhere from one-half hour to "a couple of hours," can lift a gallon of milk with her right hand, but

3

hardly anything with her left hand, can bend at times, and might be able to kneel. (*Id.* at 62-63, 69, 70).

Cephas is bipolar, is on medication, and receives treatment. (*Id.* at 54). She has also been treated for depression, but she feels "a lot better." (*Id.* at 55-56). Cephas takes Cymbalta, Trazodone, and Abilify for her mental condition. (*Id.* at 56). Cephas testified that she has difficulty sleeping, but goes back to sleep when she takes medication. (*Id.* at 58). Her memory is poor. (*Id.*). She gets angry with her family, she has mood swings, racing thoughts, paranoid thoughts, trust issues, does not like going to places with crowds, and has panic or anxiety attacks. (*Id.* at 59, 61).

## C.   Plaintiff's Medical History, Condition, and Treatment

### 1.   Medical

Medical records indicate that Cephas was diagnosed with diabetes on August 2, 2010 and underwent medical nutritional therapy to control it. (D.I. 8-7 at 13-24). She has been diagnosed with chronic obstructive pulmonary disease, which is managed with medication, and she uses a CPAP machine.[1] (D.I. 8-8 at 47, D.I. 8-9 at 21, 65-82).

Cephas, who was employed at the time, was seen in 2010 and 2011 by Eric T. Schwartz, M.D., for evaluation and treatment of bilateral hand pain. When she was seen by Dr. Schwartz on February 22, 2011, for re-evaluation of bilateral hand pain, greater in the left hand, he recommended light duty with limitations. (D.I. 8-7 at 32-33). Cephas was "very unhappy about this" and felt that he should "completely disable her."

---

[1]Cephas underwent pulmonary function tests in January 2014 and her physician stated, "I don't think she has COPD. Her PFTs are almost normal." (D.I. 8-9 at 67).

(*Id.*). Dr. Schwartz was "uncomfortable" proceeding with surgery and recommended "follow through with pain management and a second orthopedic opinion." (*Id.*)

On March 26, 2012, State agency consultant Michael H. Borek, D.O., opined that Cephas appeared capable of light duty, "frequent by non-continuous." (D.I. 8-3 at 7). He considered Cephas' complaints of bilateral hand pain and diagnoses of bilateral carpal tunnel syndrome, "moderate by EMG," and bilateral upper extremity neuralgia. (*Id.*). Dr. Borek recommended that Cephas have limited environmental hazard and allergen restrictions due to her mild COPD and noted that she has handling and fingering limitations due to bilateral carpal tunnel. (*Id.*).

Cephas was treated by Robert J. Varipapa, M.D., for her hand conditions. (D.I. 10-40, 47-76). Physical therapy was ordered, which she attended from July 2, 2012 to October 3, 2012. (*Id.* at 77-92). Cephas underwent right carpal tunnel release surgery in October 2012 and left carpal tunnel release in July 2013. (D.I. 8-9 at 29, 33-40). She was medically cleared on the right carpal tunnel release on September 27, 2012 and was doing fine. (*Id.* at 21).

Prior to the left carpal tunnel release, on November 29, 2012, a State agency consultant affirmed the medical findings of the March 26, 2012 disability determination. (D.I. 8-3 at 44). The consultant opined that although problems with carpal tunnel syndrome were again noted, the degree and extent of the findings of record did not significantly alter the functional capacity assessment. (*Id.*). The consultant determined that Cephas could perform light work; including occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds; stand and/or walk and sit about 6 hours in an 8-hour day; she is limited in both upper extremities and push and/or pull; occasionally

5

perform postural activities but never climb ladders, ropes, scaffolds; unlimited reaching
in any direction, limited handling in both hands, limited fingering in both hands, and
limited feeling in both hands, avoid concentrated exposure to heat, cold, wetness,
humidity, fumes, odors, dust, gases, poor ventilation, and hazards. (D.I. 8-3 at 41-44).

In January 2013, Plaintiff was evaluated by a rheumatologist, diagnosed with
fibromyalgia, and prescribed Lyrica. (D.I. 8-9 at 61-63). She is regularly monitored.
(Id. at 42-63). In May, 2013, the dose of Lyrica was increased from 75 mg to 150 mg,
twice a day. (Id. at 54-55). As of August 26, 2013, Cephas complained of diffuse pain
in the upper and lower extremities and torso. (Id. at 46). She complained of chronic
fatigue and disturbed sleep, but indicated that she was tolerating medication. (Id.)

In October 2013, Cephas denied any right wrist pain and, despite some left wrist
pain, she had good grasp and grip strength. (Id. at 29, 34-40). On November 14, 2013,
Cephas reported that the carpal tunnel had improved, but complained of left hand pain,
left thumb pain, and clicking of her finger. (Id. at 3). She assessed her pain at 4/10
with medication, and worse at night. (Id.). She was diagnosed with left thumb arthritis
on November 23, 2013, but refused a cortisone injection. (Id. at 24).

When Cephas was seen by her rheumatologist on November 26, 2013, she
presented with complaints of knee pain, right arm pain on range of motion, neck and
back pain with activity, muscle pain, and constant joint pain. (Id. at 42). She relayed
that joint pain occurred after exertion and after trauma and that it interfered with
activities of daily living. (Id.) In addition, cold and damp weather exacerbated the pain.
(Id.) She was diagnosed with degenerative disc disease, fibromyalgia, obesity, back

6

pain with radiation, and carpal tunnel syndrome, prescribed naproxen and continued
with Lyrica and Cymbalta. (*Id.* at 44).

## 2.  Mental Health

Cephas was seen for orientation at Connections in November 2011, and began
individual therapy and medication management in December 2011. (D.I. 8-7 at 38-71).
She meets bi-weekly for therapy sessions. (*Id.* at 42). When she presented for
orientation on November 28, 2011, she indicated that she had been diagnosed as being
bipolar earlier in the year. (*Id.* at 71). As of March 5, 2012, her chief complaint
concerned her disability case. (*Id.* at 43). Diagnostic results were continuing
depressive symptoms and poor sleep. (*Id.*) Upon mental examination, her judgment
and insight were poor, and she had no psychotic thoughts and behaviors and no
suicidal ideation. (*Id.*) She continued with Prozac, Seroquel, and Benedryl (as a sleep
aid). (*Id.*)

Cephas was evaluated during a consultative examination on March 14, 2012 by
Joseph Keyes, Ph.D. (D.I. 8-8 at 2-9). She reported that she had stopped all drug and
alcohol use and was attending AA meetings; she was able to count backwards from 20,
recite the alphabet, and perform serial 3's to 40 with no errors; her social and
interpersonal skills were noted to be limited due to lack of friends and the statement
that she did not like to be around other people. (*Id.*) Dr. Keyes found Cephas had a
moderate degree of impairment in her ability to relate to other people, in constriction of
interests, the ability to sustain work performance and attendance in a normal work-
setting, the ability to cope with pressures of ordinary work, and the ability to perform
routine, repetitive tasks under ordinary supervision; no impairment in the deterioration

of personal habits and the ability to understand simple, primarily oral, instructions; and a mild degree of impairment in restriction of daily activities, and the ability to carry out instructions under ordinary supervisors. (*Id.* at 7, 8). Diagnoses included bipolar II disorder, learning disorder NOS (despite a lack of any such disorder in the treatment record), and a GAF score of 60.[2] (*Id.*)

On December 5, 2012, State agency physician Aroon Suansilppongse, M.D. reviewed the record. (D.I. 8-3 at 45-46). Dr. Suansilppongse noted Cephas's diagnosis of bipolar disorder and history of polysubstance abuse, and determined that the diagnosis of a learning disability was not supported by psychometric test results. (*Id.* at 46). Dr. Suansilppongse opined that Cephas has the "mental capacity for simple work related activity . . . with infrequent interactions with coworkers and the public." (*Id.*).

Cephas continued to treat with Connections from September 30, 2013 to April 22, 2014. (D.I. 8-9 at 83-100). An April 22, 2014 treatment note indicates that Cephas had an appropriate appearance and intact memory; she was oriented to person, place, time, and situation; her speech was pressured, excessive, and rambling; she had a labile affect; her memory was erratic and inconsistent; her mood was labile, anxious and depressed; and her reasoning, impulse control, judgment and insight were fair. (*Id.*

---

[2]The Global Assessment of Functioning scale considers the psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. text revision 2000). However, the GAF scale was not included in the DSM-V, for several reasons, including its conceptual lack of clarity. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013). A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM-IV-TR at 34.

8

at 84). She was assessed a GAF score of 54. (*Id.* at 85). Diagnoses included bipolar

disorder, generalized anxiety disorder, and substance abuse, in remission. (*Id.* at 83,

85). She continued with medications to treat her mental health issues. (*Id.* at 83-100).

## D. Vocational Expert's Testimony

A VE testified at the administrative hearing. (D.I. 8-2 at 70-77). The VE was

posed a hypothetical and asked whether an individual who had Cephas' vocational

profile performing unskilled work and limitations could perform past work as performed

by Cephas, described as:

> light level of exertion. . . . postural activities are all occasional – stooping,
> crouching, crawling – but no climbing of a ladder, a rope, or a scaffold. In
> general, both hands handling, fingering, feeling frequent as opposed to
> constant. In the environmental area, . . . should avoid concentrated
> exposure to temperature extremes, humidity, wetness, vibration, hazards
> – hazards are heights and moving machinery – and odors, dusts, gases,
> poor ventilation. . . . non-exertionally this individual has a simple, unskilled
> work background, would be limited to that type of work, . . . have only
> occasional contact with coworkers and the general public, work that's
> essentially isolated with only occasional supervision. . . . low-stress work
> defined as only occasional need to make decisions and to use judgment.

(*id.* at 71-72). The VE opined that such a person could perform the work of a

housekeeper for a hotel and some "floater" positions performed in the past that were

light and unskilled. (*Id.* at 72-73). He further opined there were other jobs that could be

performed at the light, unskilled level, such as sorter, inspector, mail clerk; and at the

sedentary, unskilled level, such as taper for printed circuit boards, order clerk for food

and beverage, and addresser. (*Id.* at 73).

The VE stated that the position of sorter required only occasional fingering, while

the other positions required frequent fingering. (*Id.* at 75). The VE stated that he would

"rule out" jobs that required bilateral use of the hands, but the individual could perform

9

the jobs if one hand could be used. (*Id*. at 75-76). He opined that the use of a cane would have minimal effect on sedentary jobs, but for light jobs it would eliminate the sorter, inspector, and mail clerk jobs. (*Id*. at 76).

## II. LEGAL STANDARD

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *see Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995).

Credibility determinations are the province of the ALJ. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). They should be disturbed on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001).

## III. REGULATORY FRAMEWORK

Within the meaning of social security law, a "disability" is the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C.

10

§§ 423(d)(1)(A); 1382c(a)(3). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." *See* 20 C.F.R. § 404.1505. The claimant bears the initial burden of proving disability. *See* 20 C.F.R. §§ 404.1512(a), 416.905; *Podeworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984). To qualify for disability insurance benefits, the claimant must establish that she was disabled prior to the date she was last insured. *See* 20 C.F.R. §§ 404.131, 416.912(a); *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe). If claimant's impairments are severe, at step three the Commissioner compares the

11

claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work.[3] See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listings, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any of the listings, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(d), 416.920(e).[4]

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4 )(iv), 416.920(a)(4)(iv) (stating a claimant is not disabled if able to return to past relevant work). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step the burden is on the Commissioner to show that the claimant is capable of performing other

---

[3]Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii-iii), 416.920(a)(4)(ii-iii).

[4]Prior to step four, the Commissioner must assess the claimant's RFC. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)).

available work before denying disability benefits. *See id.* In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC.]" *Id.* This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments, and a vocational expert is usually consulted.

At step one, the ALJ found that Cephas met the insured status requirements of the Act through March 31, 2014, and that she had not engaged in substantial gainful activity since June 13, 2012, the alleged onset date. (D.I. 8-2 at 15). At step two, the ALJ found that Cephas had the following severe impairments: bilateral carpal tunnel syndrome, fibromyalgia, obesity, depression, anxiety, and a history of substance abuse. (*Id.* at 16). At step three, the ALJ determined that Cephas' impairments did not meet or equal the criteria of any of the impairments in the Listing of Impairments. (*Id.*). The ALJ found that Cephas had

the [RFC] to perform light work,[5] . . . except postural activities are all

---

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). The Social Security Regulations define sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

13

occasional, but no climbing of a ladder, rope, or a scaffold; frequent as opposed to constant handling, fingering, and feeling bilaterally; should avoid concentrated exposure to temperature extremes, humidity, wetness, vibration, odors, dust, gases, poor ventilation, and hazards, defined as heights and moving machinery. Non-exertionally, limited to simple unskilled work; work with only occasional contact with co-workers and the general public; work that is essentially isolated, with only occasional supervision; and low stress work, defined as only occasional need to make decisions and use judgment.

(*Id.* at 18) (footnote added). At step four, the ALJ found that Cephas was able to

perform her past relevant work as a housekeeper and floater. In the alternative, at step

five, based on the VE's testimony, the ALJ determined there were other jobs that exist

in significant numbers in the national economy that Cephas can perform, and,

therefore, she was not under a disability from June 13, 2012 through the date of the

May 8, 2014 decision. (*Id.* at 22-24).

## IV.   DISCUSSION

Cephas filed her complaint *pro se*. Therefore, the Court must liberally construe

her pleadings, and "apply the applicable law, irrespective of whether [she] has

mentioned it by name." *Holley v. Department of Veteran Affairs*, 165 F.3d 244, 247-48

(3d Cir. 1999); *see also Leventry v. Astrue*, 2009 WL 3045675 (W.D. Pa. Sept. 22,

2009) (applying same in the context of a social security appeal).

Cephas argues that she is stricken with a combination of impairments that meet

the definition of disability according to Social Security law, her condition has not

improved, and she is unable to work. The Commissioner argues that Cephas

improperly submitted additional evidence on appeal that was neither new nor material,

---

20 C.F.R. § 404.1567(a).

14

and she failed to provide good cause for not providing the evidence earlier. The
Commissioner further contends that substantial evidence supports the decision that
Cephas was not disabled under the Act.

## A.    Substantial Evidence

"The final responsibility for determining a claimant's residual functional capacity
is reserved to the Commissioner." *See Breen v. Commissioner of Soc. Sec.*, 504 F.
App'x 96, 99 (3d Cir. Nov. 14, 2012) (citing 20 C.F.R § 404.1546(c)). Here, the ALJ
considered the effects of Cephas' condition in relation to her ability to perform work.
The ALJ found that Cephas has the severe impairments of bilateral carpal tunnel
syndrome, fibromyalgia, obesity, depression, anxiety, and a history of substance abuse.

The ALJ's decision makes clear that she thoroughly reviewed Cephas'
longitudinal treatment history. (D.I. 8-2 at 6-12). Cephas complained that she could not
work because of pain associated with carpal tunnel syndrome and fibromyalgia, but, as
noted by the ALJ, medical records indicate that in October 2013 Cephas denied right
wrist pain and, even with some left wrist pain, had good grasp and grip strength. (*Id.* at
18). In addition her treatment for fibromyalgia was limited to medication and
recommendations for exercise. (*Id.*). Further, as discussed by the ALJ, although
diagnosed with left thumb arthritis, Cephas refused a cortisone injection, while, at the
same time, noting that her carpal tunnel had improved. The ALJ observed Cephas' use
of a cane at the administrative hearing, but found nothing in the record to indicate the
cane was medically prescribed. (*Id.* at 20).

In addition, in assessing Cephas' physical RFC, the ALJ afforded great weight to
the State agency medical consultants who found Cephas capable of work at a light level

15

of exertion with occasional postural activities, but no climbing of a ladder, rope, or scaffold, limited handling, fingering, and fingering with both hands, and environmental limitations. (*Id*. at 21). While these assessments occurred prior to Cephas' diagnosis of fibromyalgia and prior to the time that Cephas underwent the left carpal tunnel release, the ALJ did not "elevate her own medical opinion over those of these physicians, but rather made [findings] based on all of the evidence in the record, including evidence not considered by the [state agency] reviewing physician[s]." *See Callahan v. Colvin*, 2014 WL 7408700, *1 n.1 (W.D. Pa. Dec. 30, 2014).

Cephas has been diagnosed with fibromyalgia. In evaluating fibromyalgia, courts acknowledge that symptoms of the disease are entirely subjective and medical testing may not be able to assess its severity. *Singleton v. Astrue*, 542 F. Supp. 2d 367, 377 (D. Del. 2008) (citing *Wilson v. Apfel*, 1999 WL 993723, *1 n.1 (E.D. Pa. Oct. 29, 1999)). Because of the subjectivity of the symptoms of fibromyalgia, the credibility of a claimant's testimony is paramount when evaluating whether a claimant's fibromyalgia impairment is disabling. *Singleton*, 542 F. Supp. 2d at 378.

In discussing the fibromyalgia diagnosis, the ALJ referred to the medical records of Cephas' rheumatologist, noting the diagnosis, that Cephas takes Lyrica, that she is monitored, and that her treatment is limited to medication. The ALJ's thorough assessment of Cephas' medical condition demonstrates that she understood the circumstances present in a case involving the disease of fibromyalgia. The ALJ fully detailed Cephas' subjective complaints of pain and her testimony regarding daily living activities, and then gave a detailed explanation why she found Cephas not entirely credible and her subjective complaints not fully persuasive. (D.I. 8-2 at 16, 18-22).

16

After a thorough review of the objective medical evidence, the ALJ then explained why the clinical documentation underlying the opinion evidence also undercut Cephas' credibility as to the severity of her symptoms. (*Id.* at 20-21). For example, Cephas indicated a resolution of right hand pain, she was diagnosed with only mild arthritis of the left thumb, her treatment of the upper extremities ended in November 2013 with no activity limitations imposed by her orthopedic surgeon, and her treatment for fibromyalgia is limited to medication. (*Id.* at 20).

With regard to mental health issues, Cephas testified that her depression and anxiety were "a lot better" on medication. (*Id.*) The ALJ gave great weight to the opinions of Dr. Keyes with regard to Cephas' mental condition, and further considered that. as of September 2013, Cephas' treatment remained limited to monthly medication management appointments. (*Id.* at 20-21).

The substantial evidence of record supports the ALJ's residual functional capacity assessment for light work with limiting factors such as occasional postural activities, no climbing of a ladder, rope, or a scaffold, frequent as opposed to constant handling, fingering, and feeling bilaterally, avoiding concentrated exposure to temperature extremes, humidity, wetness, vibration, odors, dust, gases, poor ventilation, and hazards, defined as heights and moving machinery. Non-exertionally, the ALJ limited Cephas to simple unskilled work, with only occasional contact with co-workers and the general public, that is essentially isolated, with only occasional supervision, low stress work, defined as only occasionally needing to make decisions and to use judgment.

17

The ALJ thoroughly analyzed the medical evidence, considered the medical opinions, and appropriately relied upon the testimony of the VE. Accordingly, the Court finds that substantial evidence supports the ALJ's ruling and her evaluation of Cephas' RFC.

## B. New Evidence

Plaintiff submitted additional medical records with her motion for summary judgment, some of which were not before the ALJ when she rendered her decision. When a claimant submits evidence after the ALJ's decision, that evidence cannot be used to support the challenge that the ALJ's decision was not based on substantial evidence. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Pursuant to 42 U.S.C. § 405(g), sentence six, this Court may, however, order a remand based upon evidence submitted after the ALJ's decision, but only if the evidence satisfies three requirements: (1) the evidence is new; (2) the evidence is material; and (3) there was good cause why it was not previously presented to the ALJ. *Matthews*, 239 F.3d at 593.

Cephas does not meet the requirements. First, some of the evidence is new and, hence, is not material to her claim for benefits from June 13, 2012, the alleged onset date, through May 8, 2014, the date of the decision. Also, some of the new records are dated at a time after the disability period in question. "[A]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984); *see also*

18

*Nieves v. Commissioner of Soc. Sec.*, 198 F. App'x 256, 260 n.3 (3d Cir. 2006) ("Our determination [that the ALJ's decision in 2001 was based on substantial evidence] is in no way swayed by the fact that in October of 2003 an ALJ determined that the petitioner was disabled. Under 42 U.S.C. § 405(g), the Court's review is limited to the evidence in the record at the time of the ALJ's 2014 decision. Finally, Cephas provided no explanation, much less good cause, for her failure to present the records she filed on June 27, 2016. Hence, the Court finds no basis to remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).[6]

## V. CONCLUSION

For the reasons discussed above, the Court will: (1) deny Cephas' motion for summary judgment (D.I. 11); and (2) grant the Commissioner's cross-motion for summary judgment (D.I. 15).

A separate order will be entered.

---

[6]Plaintiff has available the option of filing a new application should she believe the new evidence supports an award for DIB benefits. *See* 20 C.F.R. § 416.330(b).

19